UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Ronald H. Rutledge,                                                    Civ. No. 05-1313 (PAM/JSM)

                Plaintiff,

      v.                                                                 **MEMORANDUM AND ORDER**

Liberty Life Assurance Company of
Boston,

                Defendant.

---

This matter is before the Court on cross-Motions for Summary Judgment. For the reasons that follow, Defendant's Motion is granted, and Plaintiff's Motion is denied.

**BACKGROUND**

This is an insurance coverage dispute, in which Plaintiff Ronald Rutledge seeks long-term disability ("LTD") benefits from Defendant Liberty Life Assurance Company of Boston under an employee welfare benefit plan governed by the Employee Retirement Income Security Act ("ERISA"). In 1980, when Plaintiff was seventeen years old, he was involved in a snowmobile accident and suffered a compression fracture of his T-12/L-1 vertebra. He recovered fully except for slight numbness in his left leg and difficulty with urination. Andersen Corporation hired Plaintiff as a factory window assembler in 1983, and he worked in this job for the next seventeen years.

While employed at Andersen, Plaintiff participated in a Group Disability Income Policy ("Policy"), which was issued by Defendant. The Policy provided a twenty-four month period of disability for an individual who was not able to perform the duties of his own occupation.

Thereafter, the Policy defined a disabled person as one "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." (Compl. Ex. 1 at 6.) "Any Occupation" was defined as an occupation that the insured individual "is or becomes reasonably fitted by training, education, experience, age, [and] physical and mental capacity." (Id. at 5.)

In 1998, Plaintiff began to experience urinary incontinence, although only when he was sleeping or resting. In late 1999, he began self-catheterization. An MRI revealed bulging disc problems, and Plaintiff saw a lower back specialist, Dr. Thomas Rieser, who recommended spinal surgery to relieve pressure on the spinal cord. Plaintiff took a leave from work for the surgery in February 2000. He submitted a disability claim form on June 27, 2000, declaring a disability resulting from the snowmobile accident. On July 18, 2000, Defendant notified Plaintiff that he was entitled to "own occupation" benefits beginning on August 8, 2000. Post-surgery, Dr. Rieser had projected that Plaintiff would be able to return to work in September 2000, but on September 6, 2000, Plaintiff's primary physician, Dr. Neal Melby, determined that Plaintiff was unable to work due to bladder and rectal spasms with incontinence.

In October 2000, Dr. Rieser opined that Plaintiff could lift twenty pounds, stand and walk for four to six hours a day, sit for four to six hours a day, and carry and lift for two to four hours a day. He further noted that Plaintiff had "no real back pain at this time." (R. at 700.) By May 2001, Dr. Rieser felt that Plaintiff could return to work with restrictions of lifting no more than twenty to thirty pounds and no repetitive lifting, bending, or twisting.

In February 2001, two of Plaintiff's treating doctors recorded disparate assessments of him. On February 7, 2001, Dr. Melby noted that Plaintiff was developing numbness and

2

weakness in his legs. Two weeks later, Dr. Robert Maxwell saw Plaintiff on a referral and concluded that Plaintiff had perfect strength in his lower extremities, and any loss of sensation in his legs did not affect his ability to walk.

Defendant paid Plaintiff "own occupation" benefits for the full twenty-four month period provided by the Policy. On February 7, 2002, Defendant notified Plaintiff that the "own occupation" period would expire in August 2002, and that it would seek additional medical information to support his disability claim under the "any occupation" definition.

In January 2002, Plaintiff underwent bladder augmentation to expand his bladder capacity. In July 2002, Plaintiff's urologist, Dr. Steven Siegel, noted that Plaintiff had benefitted from the augmentation but had begun to have fecal incontinence. Plaintiff continued to need self-catheterization four to six times a day.

Meanwhile, Plaintiff filed an application for Social Security Disability Insurance Benefits ("SSDIB"). The application was initially denied in late July 2002, and Plaintiff appealed. On August 15, 2002, Defendant told Plaintiff it had tentatively decided not to extend benefits past the twenty-four month period.

Dr. Melby wrote on August 7, 2002, that Plaintiff had good success with his urinary incontinence. However, a few weeks later, Dr. Melby opined that Plaintiff could not urinate on his own at all and required a catheter. Dr. Melby noted further that Plaintiff complained of numbness in the pelvic area and right lower leg, weakness, chronic pain in his lower back, and intense discomfort if he stood or sat for more than an hour. However, Dr. Melby did not prescribe any pain medication. This treatment note is the only medical evidence of Plaintiff's

claim of back pain after his surgery. Dr. Melby also wrote that Plaintiff "essentially is a paraplegic, although he is able to walk." (R. at 217, 415.) Dr. Melby noted that Plaintiff was seeking disability benefits, but he recommended that Plaintiff find another job at Andersen.

In December 2002, Plaintiff reported periods of depression to Dr. Melby, but he declined a prescription for anti-depressant medication. Plaintiff was not taking any other medications, such as pain medication, on a regular basis at this time. Plaintiff's last visit to Dr. Melby was in January 2003.

Due to variant medical reports, Defendant hired a company to conduct surveillance of Plaintiff on at least nineteen days in 2003. On February 18, 2003, an investigator followed Plaintiff into a local bar. The investigator observed Plaintiff drink two beverages. Approximately three hours after he entered the bar, Plaintiff went to the restroom. Over the course of five hours, Plaintiff consumed five beers and went to the restroom three times. On this day and numerous other days, the investigator saw Plaintiff walking without limitation.

On March 27, 2003, the Social Security Administration ("SSA") awarded SSDIB to Plaintiff. The Administrative Law Judge ("ALJ") found that Plaintiff could not perform any occupations existing in significant numbers in the regional or national economy because of his fecal and urinary incontinence. However, the ALJ noted that Plaintiff was scheduled to have surgery for his fecal incontinence and recommended a medical review of his file within a year.

Plaintiff completed an activities questionnaire in April 2003 on which he reported he could sit for twelve hours a day, forty-five minutes to one hour at a time; stand for four hours a day, forty-five minutes to one hour at a time; and walk for one hour a day.

In May 2003, Dr. Parker reported to Defendant that Plaintiff's only restriction was access to a bathroom. Dr. Melby disagreed, stating that Plaintiff was totally disabled due to urinary and fecal incontinence and numbness in his ankle and leg.

Defendant referred Plaintiff's file to Dr. John Holbrook, a specialist in internal medicine. Dr. Holbrook concluded that the medical record did not substantiate Dr. Melby's opinion. He did not find objective medical evidence of Plaintiff's claims of leg weakness and inability to sit longer than an hour, or of Dr. Melby's opinion that Plaintiff was essentially a paraplegic. Although he agreed Plaintiff could not void urine on his own, he thought the bladder surgery and self-catheterization adequately resolved the problem. Dr. Holbrook concluded that Plaintiff could work full-time in a sedentary job with the restrictions of lifting no more than twenty pounds, access to a bathroom, and the ability to self-catheterize four to six times a day.

Vocational disability consultant Mary O'Malley reviewed Plaintiff's file and concluded on August 6, 2003, that he could work as a bench assembler, parking attendant, light machine operator, cafeteria worker, or restroom attendant. These jobs provide bathroom breaks on an as-needed basis or during scheduled breaks. In forming her conclusions, Ms. O'Malley specifically considered Dr. Holbrook's opinion that Plaintiff could work at a sedentary or light level with a lifting restriction of twenty pounds, access to a bathroom, and ability to self-catheterize.

On March 3, 2004, Plaintiff completed an activity statement on which he reported he could sit for eight hours, one hour at a time; stand for two hours, thirty minutes at a time; and

walk for one hour, thirty minutes at a time. He described his limitations as urinary and fecal incontinence. He did not mention either pain or depression.

On March 29, 2004, Plaintiff had surgery to implant an artificial bowel sphincter. His physician, Dr. Susan Parker, considered the operation successful and told Defendant on June 2, 2004, that Plaintiff had no restrictions.

Defendant again requested more medical information from Plaintiff to support his claim of disability from any occupation. Although Dr. Melby had not seen or spoken to Plaintiff in almost a year, he responded to Defendant on June 30, 2004, that Plaintiff remained disabled by bladder and sphincter problems, numbness in his legs, and chronic pain in his lower back. Dr. Melby also told Defendant that Plaintiff suffered from depression.

Dr. Holbrook reviewed Plaintiff's records again in July 2004. He contacted Dr. Parker, who said Plaintiff was able to work full-time with minimal restrictions. Dr. Holbrook accounted for Plaintiff's self-described limitations and Dr. Melby's restrictions, finding these reports inconsistent with the record. Dr. Holbrook concluded that Plaintiff could perform full-time, sedentary work with a lifting restriction of twenty pounds, access to a bathroom, and the ability to self-catheterize four to six times a day. Dr. Anthony Parisi, an orthopedist, reviewed Plaintiff's medical records in August 2004 and concurred with Dr. Holbrook's conclusions, although he indicated his opinion was limited to orthopedic conditions. Dr. Parisi agreed with Dr. Rieser's earlier opinion that Plaintiff could return to work with a lifting restriction of twenty to thirty pounds and no repetitive lifting, bending, or twisting.

On September 2, 2004, Defendant's case manager left Plaintiff a telephone message

stating that review of his claim was complete and benefits would be reinstated. However, the manager had misread a vocational report recently completed by vocational consultant Patricia Thal in which she confirmed Ms. O'Malley's findings. The case manager misunderstood the report to say that no readily available occupations existed for Plaintiff. When the manager discovered the mistake a few days later, Defendant rectified its decision and officially denied Plaintiff's claim on September 30, 2004. In the five-page letter sent to Plaintiff, Defendant recounted the medical evidence supporting its position, relying primarily on recent medical records from Dr. Parker and Dr. Holbrook. Defendant found Plaintiff able to work as a machine operator.

Plaintiff appealed the adverse decision, and Defendant denied the appeal. Plaintiff then brought suit under 29 U.S.C. § 1132(a)(1)(B), alleging wrongful denial of benefits.

**DISCUSSION**

**A.     Standard of Review**

If the language of a disability benefits policy vests an insurer with the "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," a court must apply the abuse of discretion standard of review to the claim determination. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If the insurer does not have such discretionary authority, a court must review the denial of benefits de novo. Id. Here, the Policy states that Defendant has "the authority to construe the terms of this policy and to determine benefit eligibility hereunder. [Defendant's] decisions regarding construction of the

7

terms of this policy and benefit eligibility shall be conclusive and binding." (Compl. Ex. 1 at 29.) Such language vests Defendant with discretionary authority, see Hawkeye National Life Insurance Co. v. AVIS Industrial Corp., 122 F.3d 490, 493, 496 (8th Cir. 1997), which Plaintiff concedes.

Nevertheless, Plaintiff contends the de novo standard of review applies because Defendant is both the fiduciary and the administrator of the benefit plan. In Armstrong v. Aetna Life Insurance Co., the Eighth Circuit Court of Appeals applied a de novo standard of review because the insurer, which was both the fiduciary and the administrator of the plan, gave incentives and bonuses to its claim reviewers based in part on the number of claims they denied, thereby creating an internal conflict of interest. 128 F.3d 1263, 1265 (8th Cir. 1997). The Eighth Circuit later limited the Armstrong holding to its facts, stating that there is not a blanket rule of de novo review when the insurer is also the plan administrator. Davolt v. Exec. Comm. of O'Reilly Auto., 206 F.3d 806, 809 (8th Cir. 2000); see also Woo v. Deluxe Corp., 144 F.3d 1157, 1160-61 (8th Cir. 1998) (requiring the insured to produce evidence of a substantial conflict of interest or a serious procedural irregularity in addition to a breach of the insured's fiduciary duty before changing the standard of review from abuse of discretion to de novo).

In this case, the Court will apply the abuse of discretion standard because Plaintiff has no evidence of a conflict of interest greater than that already inherent when an insurer is also the plan administrator. Likewise, there is no evidence of a serious procedural irregularity or breach of fiduciary duty. Under this deferential standard of review, a decision must be upheld

if it is "reasonable" even though the evidence may also support a different decision. <u>Cash v. Wal-Mart Group Health Plan</u>, 107 F.3d 637, 641 (8th Cir. 1997). Reasonable means only that the decision is supported by substantial evidence; that is, a reasonable person could have, but not necessarily would have, reached the same decision. <u>Groves v. Metro. Life Ins. Co.</u>, – F.3d –, No. 05-2173, 2006 WL 398615, at *2 (8th Cir. Feb. 22, 2006) (citations omitted).

**B.    The Denial of Benefits**

    1.    <u>Dr. Melby's Opinion</u>

Plaintiff first contends that Defendant should have awarded him LTD benefits based on Dr. Melby's opinion. Although Dr. Melby opined that Plaintiff was totally disabled, Defendant was not obligated to give special deference to Dr. Melby's opinion over other record evidence. <u>See</u> <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 825 (2003) (holding that the treating physician rule employed by the SSA does not apply to disability determinations made under ERISA). Dr. Parker, Dr. Rieser, Dr. Holbrook, and Dr. Parisi all agreed that Plaintiff could perform full-time work in light of his restrictions, and these opinions are supported by objective medical evidence. Moreover, Dr. Melby's opinion conflicts with reliable medical evidence, including his own treatment notes. For example, after his back surgery, Plaintiff never reported lower back pain to any other physician, and only once to Dr. Melby. Further, Dr. Melby's description of Plaintiff as essentially a paraplegic is totally unsupported by the medical evidence and the surveillance. In addition, Dr. Melby's opinion was based solely on Plaintiff's subjective complaints, not on any objective clinical data or laboratory tests. If a treating doctor's opinion is internally inconsistent and not based on objective evidence such

9

as testing, a plan administrator may deny benefits. <u>Groves</u>, 2006 WL 398615, at *3. Finally, when Dr. Melby rendered his final opinion, he had not treated Plaintiff in over a year and had not talked to him for almost a year. Plaintiff is not entitled to summary judgment based on Dr. Melby's opinion.

    2.    <u>Consideration of Impairments in Combination</u>

Plaintiff next submits that Defendant failed to consider his medical conditions in combination. On the disability claim forms, Plaintiff recorded only his spinal cord injury and incontinence, not back pain or depression. Although a plan administrator must consider all impairments, whether or not listed on the claim forms, this indicates that Plaintiff did not consider his back pain or depression to impair him. After his back surgery, Plaintiff only once complained of back pain to Dr. Melby. Other doctors noted no pain, and Plaintiff was not prescribed any pain medication. When Dr. Holbrook investigated Plaintiff's allegation of depression, Dr. Melby said it was not a concern. There is no evidence that Plaintiff's depression had any effect on his ability to work, even when considered in combination with his other ailments. There is no evidence that Plaintiff ever saw a mental health specialist, psychiatrist, psychologist, or counselor for depression. The record shows that Defendant specifically asked its consultants to consider Plaintiff's entire medical history in assessing his claim, and after reviewing the reports of Dr. Holbrook and Ms. O'Malley, the Court is satisfied that Defendant properly considered Plaintiff's impairments in combination. Consequently, the Court will not grant summary judgment to Plaintiff on this basis.

    3.    <u>No Independent Medical Examination</u>

Plaintiff faults Defendant for not obtaining an independent medical examination ("IME") or functional capacity evaluation ("FCE") during its review of his claim. An insurer need not order an IME when the insured's evidence is facially insufficient to establish disability. See Layes v. Mead Corp., 132 F.3d 1246, 1251-52 (8th Cir. 1998). Here, Defendant could determine from the medical record, including Plaintiff's own doctors' opinions, that he was not disabled under the "any occupation" standard. Dr. Rieser, Dr. Parker, and Dr. Siegel all concluded that Plaintiff had only minimal restrictions, and these conclusions are supported by objective medical evidence.

Further, the Policy did not require Defendant to conduct an IME or FCE, and failure to do so absent such language is only a factor in determining whether an insurer acted arbitrarily or capriciously. See Calvert v. Firstar Fin., Inc., 409 F.3d 286, 295 (6th Cir. 2005). In Calvert, the consulting doctor's review of the plaintiff's medical file was "clearly inadequate" because he did not describe the data on which he relied, failed to mention crucial medical evidence, and was unaware of injuries and an existing FCE in the record. Id. at 296. In contrast, Dr. Holbrook's report is accurate and thorough. He described the data on which he relied, including evidence from Dr. Melby. He accounted for all of Plaintiff's impairments, and he adopted restrictions set forth by Plaintiff's own physicians. As such, no IME or FCE was necessary.

Plaintiff's reliance on notes by Defendant's claim managers is similarly unavailing. Although some notations mentioned the possibility of an IME or FCE, the claims managers also remarked on the lack of medical evidence supporting Plaintiff's claim. These internal,

administrative notations do not establish an error by Defendant in light of the medical evidence from Plaintiff's own physicians that he is not disabled. Further, other notations reflect that Defendant's decision to deny benefits was so clear that no outside referral was necessary, and neither of the consulting physicians recommended a physical examination. In sum, the lack of an IME or FCE does not entitle Plaintiff to summary judgment.

    4.    <u>The SSA's Disability Determination</u>

Plaintiff submits that Defendant should have adopted the SSA's determination that he was disabled. However, an SSDIB determination is not binding on an insurer. <u>See</u> <u>Jackson v. Metro. Life Ins. Co.</u>, 303 F.3d 884, 889 (8th Cir. 2002); <u>Coker v. Metro. Life. Ins. Co.</u>, 281 F.3d 793, 798 (8th Cir. 2002). Furthermore, the SSA decision was rendered a year and a half before Defendant's, and during that time period, there were significant developments in the medical record. Most notably, Plaintiff received a sphincter implant that resolved his fecal incontinence. Additionally, while the SSA must give deference to the opinion of a treating physician, an insurer need not. Dr. Melby's opinion therefore was not entitled to any more consideration than other record evidence. Finally, Plaintiff's claim that Defendant did not consider the SSA determination is meritless. The two file notations referenced by Plaintiff show only that Dr. Holbrook's inquiry into Plaintiff's alcohol use was not based on SSA documents and that Defendant's decision was not contingent on an award of SSDIB. Neither of these notations reflect a refusal to consider the SSA decision. The SSA decision was in the claim file, and as Defendant was not required to mention every document it considered, Plaintiff's argument fails.

    5.    <u>Applicability of Minnesota Law</u>

Plaintiff contends that Minnesota insurance law is applicable here to show that he could not work with "reasonable continuity." Under Minnesota law, a person is totally disabled from performing any occupation unless he is "able to perform the substantial and material parts of some gainful work or occupation with reasonable continuity." <u>Maze v. Equitable Life Ins. Co.</u>

of Iowa, 246 N.W. 737, 739 (Minn. 1933). Plaintiff's argument fails for several reasons. First, the Policy in this case contains its own definitions of "totally disabled" and "any occupation," and Minnesota law is therefore irrelevant. Second, even assuming Minnesota law applies, there is ample evidence that Plaintiff can work with reasonable continuity. The specific restrictions applicable to Plaintiff as determined by his doctors are access to a clean bathroom to self-catheterize four to six times a day; stand and/or shift positions every thirty to sixty minutes; lift no more than twenty to thirty pounds; and no repetitive bending, lifting, or twisting. Such restrictions do not render Plaintiff unable to work with reasonable continuity, especially at light or sedentary jobs. Finally, the Policy's definition of disability contains the phrase "reasonable continuity," which mirrors Minnesota law, thereby rendering Plaintiff's argument moot.

      6.    <u>Defendant's Vocational Analyses</u>

Plaintiff challenges the vocational analyses conducted by Defendant, complaining that the recommended alternative positions do not pay as much as his former job. This argument is without merit as the terms of the Policy do not include salary requirements in the definition of "any occupation." In addition, the Policy explicitly provides that in determining whether a person is disabled, Defendant will not consider employment factors such as "paycuts." (Compl. Ex. 1 at 14.) Plaintiff's interpretation of the term "reasonably fitted" to include salary requirements cannot stand in light of the Policy's express language.

      7.    <u>Attorney's Fees, Costs, and Prejudgment Interest</u>

Finally, Plaintiff seeks attorney's fees, costs, and prejudgment interest under 29 U.S.C.

§ 1132(g)(1). The Court finds that such an award is not appropriate. Defendant displayed no culpability or bad faith; an award of fees would have no deterrent effect given that there was no censurable conduct by Defendant; Plaintiff did not seek to benefit other plan participants or to resolve a significant legal question; and Plaintiff's positions were without merit. See Lawrence v. Westerhaus, 749 F.2d 494, 496 (8th Cir. 1984). This aspect of Plaintiff's Motion is denied.

## CONCLUSION

Defendant's decision to deny LTD benefits to Plaintiff is supported by substantial evidence in the record. Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 20) is **DENIED**; and
2. Defendant's Motion for Summary Judgment (Doc. Nos. 25 and 40) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 10, 2006

                                              s/ Paul A. Magnuson
                                              Paul A. Magnuson
                                              United States District Court Judge